THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>GOLDKING HOLDINGS, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No.: 13-12820 (BLS)<br>(Jointly Administered)<br><br>Ref. Nos.: 11 and 26<br><br>Hearing Date: November 26, 2013 at 2:00 p.m. |

**WHITE OAK'S OBJECTION TO DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS, PURSUANT TO SECTIONS 105, 361, 362, 363, 364 AND 507 OF THE BANKRUPTCY CODE, (1) APPROVING POST-PETITION FINANCING, (2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (4) GRANTING ADEQUATE PROTECTION, (5) MODIFYING AUTOMATIC STAY, (6) SCHEDULING A FINAL HEARING, AND (7) GRANTING CERTAIN RELATED RELIEF WITH RESPECT TO THE DEBTORS' HEDGING OBLIGATIONS**

White Oak Energy V, LLC ("Energy V") and White Oak Operating Company, LLC ("OPCO" and together with Energy V, "White Oak") together file their Objection to Debtors' Motion (the "DIP Motion")[2] for Interim and Final Orders, Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, (1) Approving Post-Petition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, (5) Modifying Automatic Stay, (6) Scheduling a Final Hearing, and (7) Granting Certain Related Relief With Respect to the Debtors' Hedging Obligations (the "Objection"). In support of the Objection, White Oak represents as follows:

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: Goldking Holdings, LLC (2614); Goldking Onshore Operating, LLC (2653); and Goldking Resources, LLC (2682). The mailing address for the Debtors is 777 Walker Street, Suite 2500, Houston, TX 77002.

[2] Capitalized terms not herein defined shall have the meaning ascribed to them in the DIP Motion.

ACTIVE 23221871v3

## BACKGROUND

### A. The Bankruptcy Cases

1. On October 20, 2013 (the "Petition Date") the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

2. The Debtors continue to operate their businesses and manage their property as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3. On the Petition Date, among other first day relief requested, the Debtors filed the DIP Motion.

4. On October 31, 2013, the Court granted the DIP Motion on an interim basis and set the motion for final hearing on November 26, 2013. On November 11, 2013, the Debtors filed their Notice of Proposed Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Post-Petition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, and (5) Modifying Automatic Stay (hereafter, the "Proposed Final Order").

### B. White Oak's Claims

5. White Oak is a creditor and party in interest in these cases. White Oak's commercial relationship with Debtors relates back to a 2010 sale transaction between Energy V and Goldking Holdings, LLC. Specifically, the Debtor Goldking Holdings, LLC acquired certain oil and gas assets from Energy V for approximately $39 million. In connection therewith, the parties executed the Purchase and Sale Agreement dated July 19, 2010 by and between Energy V and Goldking Holdings, LLC (the "Original Purchase Agreement"), as

2

amended by the Third Amendment to Purchase and Sale Agreement dated August 31, 2010 (the "Third Amendment").

6. Pursuant to the Third Amendment, there was a $950,000 performance bond which relates to property at the Berry Lake Field in Iberville Parish, Louisiana.

7. In addition, in connection with the 2010 transaction, there was a $500,000 "holdback" owing to Energy V. Once certain consents to transfers were obtained from third parties, Energy V was then entitled to payment of the holdback amount.

8. Since the acquisition, there have been disputes between the Debtors and White Oak relating to the performance bond and the holdback. Effective in July 2013, the parties entered into a Compromise and Forbearance Agreement (the Forbearance"). That agreement, among other things, provides for the replacement of the current performance bond on the terms and conditions set forth in the Forbearance. Also, the holdback owing to White Oak was reduced to $300,000, with all obligations owing to Energy V secured by a deed of trust on certain properties.

9. As acknowledged on the Debtors' petitions, OPCO holds an unsecured claim equal to at least $164,686.76 against the Debtors [D.I. 1]. In fact, OPCO's claim is listed as the second largest unsecured claim against the Debtors. This pre-petition claim relates to an obligation owing to OPCO under an operating agreement.

10. Further, White Oak holds certain other contingent contractual and indemnification claims relating to the properties which it sold to the Debtors in the 2010 transaction including, without limitation, in relation to uncapped oil and gas wells.[3]

---

[3] White Oak reserves all rights to file any claim against the Debtors and to assert statutory liens, if available, under applicable law with respect to any of the aforementioned obligations.

3

## OBJECTION

11. As a creditor with unsecured and perfected secured claims, White Oak objects to final approval of the proposed financing (the "DIP Financing") under the DIP Motion for the following reasons: (i) the DIP Financing "primes" White Oak and other pre-petition secured parties, yet fails to adequately protect them; (ii) the rollup of pre-petition debt in these cases is unwarranted and prejudices other pre-petition creditors; (iii) the terms of the proposed post-petition financing, especially the scope of what is encumbered, are overreaching and not necessary given Wayzata's secured position; (iv) the financing as proposed by the DIP Motion gives Wayzata overly broad control over the Debtors and these chapter 11 cases; (v) the length and scope of the challenge period is insufficient; and (vi) the Debtors' burden that no alternative financing is available has not been met.

### A. The DIP Financing "Primes" Pre-Petition Secured Parties Without Adequate Protection

12. Bankruptcy Code section 364(d) requires that in order for a debtor to obtain credit secured by a senior (or equal) lien on estate property that is already subject to a lien that: (a) the debtor is unable to obtain such credit otherwise; and (b) there is adequate protection of the existing security interest to be "primed." 11 U.S.C. § 364(d). Further, a debtor bears the burden of demonstrating such adequate protection has been provided. Id. Here, White Oak submits that these Debtors cannot meet their burden of proof.

13. The proposed DIP Financing is not exactly a model of clarity regarding which secured creditors are not subject to Wayzata's proposed priming lien to secure its post-petition financing. What is clear is that Wayzata would be the only recipient of a replacement lien as adequate protection for its pre-petition collateral.

14. Paragraph 2.1.2. of the Interim DIP Order[4] provides that Wayzata's liens on "Collateral" (defined as pre- and post-petition collateral) shall be subject to only (i) "Permitted Liens" and (ii) "Carve Out Expenses". "Permitted Liens" are not defined in either the Interim DIP Order or the DIP Motion. Attached to the latter is, among other things[5], the "Existing Credit Agreement". That agreement includes a definition of "Permitted Liens": liens permitted to exist under Section 6.1 therein.

15. Section 6.1 begins with a reference to liens securing obligations owing to Wayzata, followed by a reference to liens in Schedule 6.1 – which is blank. Other Permitted Liens are listed thereafter in Section 6.1. However, it is not clear to White Oak whether its liens in connection with the Debtors' obligations under the Forbearance Agreement are included.[6] Without clarification, White Oak must object to the DIP Financing on this basis.

16. If White Oak does not have a "Permitted Lien," then Wayzata's pre- and post-petition liens would "prime" White Oak's security interest. Yet, the proposed DIP Financing does not offer adequate protection to any party other than Wayzata itself. *See* Paragraphs 2.6.1 - 2.6.3 of Interim DIP Order. Wayzata is granted a "Replacement Lien" in all pre- and post-petition collateral, senior to all but the "Permitted Liens" and Wayzata's DIP Financing. As additional adequate protection offered only to Wayzata, it is granted a super priority claim under section 507(b) of the Code.

---

[4] Based upon the blacklined version of the Proposed Final Order filed with the Court on November 11, 2013, the provisions in the Interim DIP Order cited herein mirror the Proposed Final Order.

[5] The DIP Motion with attachments is 276 pages in length.

[6] Adding to the lack of clarity is Paragraph C (iii) of the Interim DIP Order, with a defined term "Permitted Encumbrances", which definition appears to be narrower than the term "Permitted Liens", although the former term is not used thereafter.

17. Therefore, if White Oak does not fall within the definition of Permitted Lien, not only would White Oak's security interest be subordinate to Wayzata's priming and replacement liens. It will be subject to Wayzata's super priority claim under section 507(b). This failure to provide a secured creditor with adequate protection violates section 364(d) of the Bankruptcy Code and the DIP Financing cannot be approved on this basis.[7]

**B.      The Proposed Roll-Up Should Not Be Approved**

18. White Oak objects to the roll-up of Wayzata's pre-petition secured indebtedness. *See* Interim DIP Order at Paragraph 1.4. The proposed DIP Financing is in the amount of $16.1 million, but the approximately $12 million in "Pre-Petition Obligations" will be satisfied upon entry of a "Permanent Financing Order". *Id.* In other words, only about 25% of the proposed financing is "new money", a strikingly small amount in comparison.

19. Courts are resistant to approve the roll-up of pre-petition debt into debtor-in-possession financing except under extraordinary circumstances. *Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor"); *In re Tenney Village Co., Inc.*, 104 B.R. 562, 570 (holding that "Section 364(d) speaks only of the granting of liens as security for <u>new credit</u> authorized by the Court") (emphasis added). Indeed, this sensitivity is why Local Rule 4001-2 includes roll-ups among the provisions to be highlighted and justified within a post-petition financing motion.

---

[7] Even if White Oak were offered adequate protection in the form of replacement liens, it is the Debtors' burden to provide evidence in support of the replacement liens constituting adequate protection. *See RTC v. Swedeland Dev. Group*, 16 F.3d 552, 567 (3d Cir.1994) (en banc) (requiring tangible proof of adequate protection); *see also In re Mosello*, 195 B.R. 277 (Bankr. S.D.N.Y 1996) ("A finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis.").

20.     White Oak submits that this Court should apply heavy scrutiny under the present scenario where the lender is an insider of the Debtors (described in more detail below). That fact coupled with the other troublesome provisions described herein dictates that a roll-up is entirely inappropriate in this instance.

C.  **Liens on Avoidance Actions Should Not Be Approved**

21.     Avoidance actions are property of the estate created by a debtor's bankruptcy filings, and accordingly are typically reserved for unsecured creditors. *See Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. P'ship IV,* 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully a part of the bankruptcy estate, even if they have been transferred away."); *In re Cybergenics Corp.*, 226 F.3d 237, 244 (3d Cir. 2000) (holding that avoidance actions are not property of the debtor but rather are created by operation of bankruptcy law and belong to the debtor's creditors); *In re Edison Bros. Stores, Inc.*, No. 95-1354-PJW, A-97-171, CIV.A. 98-547-SLR, 2001 WL 652025, at *1 n.1 (D. Del. Jan. 12, 2001) ("Fraudulent transfer claims belong exclusively to plaintiff representing the creditors of the estate."). Local Rule 4001-2's disclosure and justification requirements reflect that the granting of liens on avoidance actions is an extraordinary provision.

22.     Wayzata requires both a lien on avoidance actions and a section 507(b) super priority claim against the proceeds thereof. *See* Interim DIP Order at Paragraphs 2.6.2, 2.6.3. As the case law reflects, avoidance actions and their proceeds should be preserved for unsecured creditors. The fact that the lender is an insider whose pre-petition transactions may be subject to a challenge makes this feature of the DIP Financing a particularly bad idea. And this adequate protection is not even necessary. According to the Debtors' filings, the outstanding balance of

7

its secured debt owing to Wayzata is approximately $12 million. Relative to that level of indebtedness, the Borrowing Base under the Existing Credit Agreement was determined to be $18 million when Wayzata took assignment of Bank of America's ("BOA") pre-petition debt. *See* Declaration of Edward Hebert in Support of Chapter 11 Petitions and First Day Pleadings at Paragraph 15 [Docket No. 2]. Under these circumstances, Wayzata's proposed lien on avoidance actions is not only improper, but unnecessary.

23.    The DIP Motion fails to provide any justification for a lien on avoidance actions and superpriority claims other than that the lender demands it, and this Court should deny this requested feature.

D.    Liens on Other Unencumbered Assets Is Not Warranted

24.    Again, the submissions relating to the proposed DIP Financing are hazy in certain respects, including as to the scope of the proposed "Collateral". Paragraph 2.1.1. of the Interim DIP Order defines "Collateral" as the "Pre-Petition Collateral" together with the "Post-Petition Collateral", yet White Oak was unable to glean how or where the latter two terms are defined. The pre-petition collateral of BOA, assigned to Wayzata, is what it is. However, to the extent the DIP Financing is expanding Wayzata's collateral base to previously unencumbered assets, there has been a wholly inadequate showing that this is necessary. Encumbering every asset in the estate would potentially leave unsecured creditors with nothing. As explained below, Wayzata is seeking to control these cases through the DIP Financing, including through its dictated milestones for a sale process in which Wayzata is likely to be a bidder. Under this scenario, there is a particular risk to other creditors that an overreaching DIP Financing encumbering all estate property will be to their great detriment.

E.  **The Bankruptcy Code Section 506(c) Waiver Is Not Justified**

25. Final approval of the DIP Financing would include a waiver of the Debtors' right to surcharge collateral under Bankruptcy Code section 506(c).[8] Under a scenario where Wayzata is dictating a quick sale process, the Debtors must retain this right, especially since this lender-insider may be a bidder. For the same reasons stated above, White Oak fundamentally questions the need for a section 506(c) waiver under the facts and circumstances of these cases. Further, if these cases were to convert with a 506(c) waiver in place, a chapter 7 trustee might be unable to perform his or her duty to promptly liquidate the estates. Accordingly, a surcharge waiver at this point in the cases should not be approved.

F.  **The Forced Milestones Provide the Lender with Too Much Control**

26. The DIP Facility contains milestones that force the Debtors to conduct their chapter 11 in a certain manner, including the pursuit of an accelerated sale process. The approval of such milestones as a condition for the proposed financing of these cases will result in a lender-insider dictating how the Debtors conduct their chapter 11 proceedings.

27. Fundamentally, it is unclear at this point why these chapter 11 cases were commenced to begin with. On its face, Wayzata's acquired secured debt is oversecured. The total unsecured claims appear to be a manageable amount. About the only thing that can be discerned is that the filing is part of a strategy in litigation against the former CEO of the company, Leonard Tallerine. For this reason alone, the Court should be wary of allowing a debtor to relinquish so much control over this chapter 11 proceeding.

---

[8] Local Rule 4001-2(a)(i)(C) requires the Debtors disclose and justify a proposed waiver of their right to surcharge under section 506(c). To date, this justification has not been provided.

28. Here extra scrutiny should be applied to the proposed DIP Financing because the lender is also the holder of nearly 95% of the Debtors' equity. As an insider transaction, the proposed DIP Financing should be subject to rigorous examination by the Court. *See WHBA Real Estate Ltd. P'ship v. Lafayette Hotel P'ship (In re Lafayette Hotel P'ship)*, 227 B.R. 445, 454 (S.D.N.Y. 1998) ("[S]ince there is an incentive and opportunity to take advantage . . . insiders' loans in a bankruptcy must be subject to rigorous scrutiny."), *aff'd*, 198 F.3d 234 (2d Cir. 1999); *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holdings Unsecured Claims (In re Papercraft Corp.)*, 211 B.R. 813, 823 (W.D. Pa. 1997) ("[I]nsider transactions are subjected to rigorous scrutiny and when challenged, the burden is on the insider not only to prove the good faith of a transaction but also to show the inherent fairness from the viewpoint of the corporation and those with interests therein."), *aff'd*, 160 F.3d 982 (3d Cir. 1998).

29. The Debtors have requested that this Court approve the DIP Motion as an exercise of its "business judgment," adding this Court should grant the Debtors "considerable deference in the exercise of [their] sound business judgment in obtaining such credit." Motion ¶ 17. However, that is not automatically the correct standard when the directors were not disinterested or independent. *See In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011). As such, there should be sufficient time to allow parties in interest to explore that issue, considering Wayzata's close relationship to the Debtors.

30. Moreover, it is fundamental that post-petition financing should not be authorized unless it is extended in good faith. *See In re EDC Holding Co.*, 676 F.2d 945 (7th Cir. 1982); *New York Life Ins. Co. v. Revco D.S. Inc. (In re Revco D.S., Inc.)*, 901 F.2d 1359 (6th Cir. 1990) (express finding of good faith is required). The party seeking to establish good faith bears the burden of proof. *In re Revco D.S., Inc.*, 901 F.2d 1359, 1366 (6th Cir. 1990) (good faith under

section 364(e) should not be presumed). Insiders of the Debtors (in this case, a 95% shareholder) seeking to act as post-petition lenders are not acting in good faith if they are "acting principally in [their] own interests." *Norris Square Civic Assoc. v. St. Mary Hosp. (In re St. Mary Hosp.)*, 86 B.R. 393, 402 (Bankr. E.D. Pa. 1988) (Court "refuse[d] to find the terms [of the financing agreement] 'fair, reasonable, and adequate' under the circumstances," and looked "beyond the Debtor's immediate financial circumstances to determine who [was] responsible for creating those circumstances.") (citing *In re Crouse Group, Inc.*, 71 B.R. 544, 551 (Bankr. E.D. Pa. 1987)).

31. In these cases, among the required conditions for Wayzata to provide proposed post-petition financing is the Debtors' agreement to adhere to various milestones including a) entry of an order – "in form and substance satisfactory to Lender" – approving "an auction and auction procedures for the selection of a liquidator and/or a going concern purchaser . . ." by the 90th day of these cases; b) entry of an order – "in form and substance satisfactory to Lender" – "approving the selection of a liquidator and/or going concern purchaser and the sale of [the Debtors'] business and/or assets . . ." within 60 days thereafter; and c) the filing of a plan and disclosure statement, approval of a disclosure statement and confirmation of a plan within 110, 150 and 180 days after the Petition Date, respectively. Interim DIP Order at Paragraph 1.7.

32. In these types of scenarios, courts exercise caution in assessing mandated milestones, as the risk of prejudice to other parties in interest is very real. Section 364 relief is appropriate only to the extent that the terms of the post-petition financing do not "tilt the conduct of the bankruptcy case; [or] prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors." *In re Tamarack Resort, LLC.*, 2010 WL 4117459, at *11 (Bankr. N.D. Idaho Oct. 19, 2010) ("[C]ourts look to whether the proposed

terms would prejudice the powers and rights that the Code confers for the benefit of all creditors and leverage the chapter 11 process by granting the lender excessive control over the debtor or its assets as to unduly prejudice the rights of other parties in interest." (citation omitted)).

33. An insider of the Debtors providing debtor-in-possession financing should not be given such control over the direction and timing of these chapter 11 cases at this early stage – if ever. This puts not just the Debtors in a straightjacket, but also creditors. Especially in a case without a statutory committee to serve as a "watch dog", individual creditors (such as White Oak) and the US Trustee have to increase their level of vigilance. Forcing less than a month into the cases a strategic direction – a liquidation or going concern sale – under a lender-insider imposed schedule is not conducive to that added burden.

34. For these reasons, the Court should not approve Wayzata's required milestones.

### G. The Challenge Period Must Be Longer and Broader in Scope to Allow Meaningful Creditor Investigation of the Lender-Insider and Any Claims Against It

35. The DIP Financing proposes a challenge period for a creditors' committee of 60 days from its appointment and 75 days from the date of the Interim DIP Order for "any party in interest with requisite standing". Interim DIP Order at Paragraph 4.1. A committee was not appointed at the recent organization meeting, which leaves individual creditors such as White Oak to complete their own investigation by mid-January, approximately 45 days after the final hearing. This is an inadequate amount of time.

36. The Interim DIP Order is interesting in that it sets forth five areas ((a) through (e) in Paragraph 4.1) for investigation which do not appear to include causes of action against the lender-insider. On the other hand, if there is not a timely challenge, there is a broad release of the Lender and related parties of any and all claims "including but not limited to, actions or

inactions of Lender in Lender's capacity as equity ower of the Debtors . . ." Id. This carefully designed protection of an insider through narrowing the scope of an investigation and challenge and allowing the Lender a release even in its capacity as an insider-shareholder must be stricken, and the investigation and challenge period lengthened.

### H. The Debtors Must Meet Their Burden That No Financing Alternatives Exist

37. The DIP Motion and other first day pleadings are unconvincing that no alternative financing exists. While it is true that Wayzata, as assignee of BOA, is a pre-existing secured creditor with purported liens on substantially all of the Debtors' assets, it also appears that this lender may be oversecured by a significant equity cushion. The fact that "[i]n the days prior to the commencement of these cases, the Debtors pursued alternative post-petition financing" alone is not sufficient to meet their statutory burden.

### RESERVATION OF RIGHTS

38. White Oak reserves the right to amend or supplement this Objection before or at the final hearing.

### CONCLUSION

WHEREFORE, White Oak requests that the Court sustain the Objection and grant such other relief as is just and proper.

Dated: November 19, 2013
Wilmington, Delaware

FOX ROTHSCHILD LLP

Jeffrey M. Schlerf (No. 3047)
919 N. Market St., Suite 1600
Wilmington, Delaware 19801
Telephone: 302.654.7444
Facsimile: 302.656.8920

*Counsel to White Oak*